IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAFAEL RIVAS, | No. C 06-04567 JW (PR) |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |
| vs. | |
| THOMAS FELKER, Warden | |
| Respondent. | |

Petitioner, a California prisoner proceeding pro se, filed a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court granted petitioner's subsequent motion to stay the action to exhaust claims in state courts. After exhausting his claims, petitioner filed an amended petition. (Docket No. 18.) The Court ordered respondent to show cause why the amended petition should not be granted. Respondent filed an answer, and petitioner did not file a traverse although given an opportunity to do so.

**PROCEDURAL BACKGROUND**

On November 24, 2003, petitioner entered a plea of no contest in Sonoma County Superior Court to manslaughter and the use of a firearm. (Clerk's Transcript

("CT") at 101.) On May 27, 2004, the trial court sentenced petitioner to 21 years in state prison. (Id. at 122.) Petitioner received the upper base term of 11 years for voluntary manslaughter and the upper base term of 10 years for the gun enhancement. (Id.) Petitioner appealed, and on February 12, 2005, the California Court of Appeal affirmed the judgment. (Resp't, Ex. C.) On April 20, 2005, the California Supreme Court, denied review without prejudice. Petitioner filed the instant habeas action in this Court on July 25, 2006.[1]

## FACTUAL BACKGROUND

The following is taken from the probation officer's report which was relied upon by the trial court in sentencing:

> CIRCUMSTANCES: (Santa Rosa Police Department Report No. 99-9597 and Preliminary Hearing transcript dated January 24, 2003) On June 3, 1999, at approximately 9:35 PM, officers were dispatched to a 9-1-1 call at the Azteca Market building on Petaluma Hill Road, regarding an armed robbery and shooting that had just occurred. Responding officers observed the 29-year-old victim, Hector Montoya, lying on his back in a pool of his own blood on the floor. He was approximately ten feet from the front door and he was bleeding from a gunshot wound to his neck. A 34-year-old co-worker and manager of the business, Alfonso M., who was the victim's roommate and best friend, was kneeling on the left side of the victim, cradling his head on his lap. He was frantically asking for an ambulance. Paramedics and the Santa Rosa Fire Department arrived and began attending to the victim who was unconscious and unresponsive. The victim was immediately transported to Santa Rosa Memorial Hospital where he was pronounced dead on arrival at 10:00 PM. No treatment had taken place at the hospital. He had an entry wound near the left front neck area and an exit wound on the right side of his back. An autopsy conducted the following day indicated that the victim died within minutes as a result of a single gunshot wound to the left neck. The bullet penetrated the victim's chest cavity and caused extensive internal injuries and blood loss.
>
> Investigation revealed that the Azteca Market housed various businesses such as a travel agency, sports store, clothing store, and a market. The business also sold MoneyGrams and Money Orders, as well as sent money to Mexico. The spaces were leased to three separate individuals (owners of the businesses) who were Alfonso M., Benito T., and Ismael A. The Azteca Market usually closed between

---

[1] Although the docket indicates that the original petition was filed on July 27, 2006, a stamped date on the petition indicates that it was received on July 25, 2006. (Docket No. 1.)

United States District Court
For the Northern District of California

8:00 PM and 8:30 PM. Other businesses inside the building closed at 7:00 PM. After the market closed, the victim and Alfonso M. remained in the store taking care of paperwork and counting money. The victim and Alfonso M. were the two people who always closed the store. They normally left at approximately 9:30 PM. The market took in as much as $10,000 - $20,000 on a daily basis, mainly due to the sale of Money Orders and MoneyGrams. While counting the money and closing the books, employees were in plain view of the public, as there was no separate office.

Investigators determined that on June 3, 1999, at approximately 9:00 PM, the Azteca Market closed for the evening. Alfonso M. was in the store with the victim, along with Orr C., a wholesale distributor who had arrived to pick up an invoice payment. They were waiting for Benito T. who was going to stop at the store. Alfonso M. unlocked the glass doors when Benito T. arrived, but they were not re-locked as he and the victim were preparing to leave for the evening. Benito T. and Orr C. walked down a hallway into the meat department, while Alfonso M. and the victim remained near their desks, approximately ten feet from the front doors. Alfonso M. stated that two Hispanic males, one of which was later determined to be [petitioner], walked into the store via the front doors. They both wore ski masks covering their heads and faces. [Petitioner] allegedly held a nine millimeter semi-automatic handgun, tilted to the side. He was in the front, and a second unidentified suspect followed him into the office. Alfonso M. stated that [petitioner] allegedly pointed the gun at him and stated, "Give me the money!" He then allegedly pointed the handgun at the victim and then back toward Alfonso M. and stated again, "Give me the money!" The second suspect was standing behind [petitioner] and did not say anything and looked around nervously. Alfonso M. told [petitioner] that he needed to obtain the key to the store safe from his desk drawer. At that time, the victim took a step toward Alfonso M. and [petitioner] followed the victim. [Petitioner] was only a couple feet from the victim when Alfonso M. heard a gunshot. He saw the victim and [petitioner] struggling with each other, and subsequently ducked behind his desk and did not see the entire struggle. During the struggle, the victim apparently pulled the knit mask from [petitioner]'s head, as well as a sweatshirt. Both items were later found at the scene and collected as evidence. Alfonso M. was only able to see the back side of [petitioner]'s head as he remained behind his desk, due to the fact that he was afraid he was going to get shot also. He stated that the second suspect appeared to be a look-out, and did not say anything during the robbery, nor did he get involved in the struggle between [petitioner] and the victim. The second suspect immediately ran out of the store office when the handgun was fired. [Petitioner] also ran from the store after the victim was shot, and nothing was taken during the robbery.

When [petitioner] was eventually linked to the offense, Alfonso M. was re-contacted and revealed that [petitioner] had been a regular customer at the Azteca Market and regularly frequented the market. Furthermore, during testimony at the Preliminary Hearing on January 24, 2003, Alfonso M. related that after [petitioner] demanded money, he turned away to open the safe and subsequently heard the gunshot. He testified that he could not recall if the victim and [petitioner] struggled over the gun, but admitted his memory was "probably fresher and clearer" when he initially spoke to police on or about June

3, 1999. Alfonso M. also testified that after the gunshot, the victim told him, "Help me. Help me." He assisted the victim to the ground, noting that a lot of blood was coming from his neck. Alfonso M. said he "tried to plug it [the wound] to stop the bleeding."

Detectives also interviewed Orr C., who owns a grocery delivery business and does business with the Azteca Market. He stated he arrived that evening to pick up payment for an invoice. The victim unlocked the door and let him enter. Alfonso M. was present and attending to paperwork. They sat at their desk to complete the transaction and Orr C. received $1,219 in cash from the victim. While seated, he heard a vehicle horn, at which time the victim unlocked the glass doors and let Benito T. inside the building. The door was not locked after Benito T. entered. The victim returned to his desk, while Orr C. and Benito T. exited the room and went to the meat department. As they were talking, Orr heard a scuffling sound as if furniture was being moved. He looked toward the doorway and heard the victim say, "No, no, no." Orr C. walked down the hallway and observed an individual standing behind the victim's desk. He believed there was someone sitting in the chair behind the victim's desk and assumed it was the victim, but was not sure. Orr C. focused on the person standing behind the desk, who was wearing a dark colored ski mask with eyeholes. He noticed movement around the front of the desk and did not focus on what was involved in the movement and then he heard a gunshot. Orr C. immediately retreated to the meat area and heard someone say, "Money" in a loud voice. He was unsure if the word "money" was said before or after the gunshot. He then ran to where Benito T. was getting meat and they dialed 9-1-1. Benito T. provided a similar statement, and added that he was afraid that everyone in the store was going to be shot.

On June 6, 1999, officers received information that "Fifi Rivas" was involved in the attempted robbery/homicide at the Azteca Market. It was noted that [petitioner] goes by the name of "Fifi" on the streets. Furthermore, additional witnesses who were outside of the store when the attempted robbery/homicide occurred, reported that they observed a male acting suspiciously, noting that he walked out of a nearby alley by the store, and then returned. A grey vehicle, similar to a Buick, was also seen exiting the alley and contained one individual. This all occurred prior to the shooting. One witness was later contacted and viewed a photographic line-up containing [petitioner]'s picture. The witness stated that [petitioner] looked like the person she saw exit and then re-enter the alley on June 3, 1999, just prior to the attempted robbery/homicide.

. . . .

On July 6, 2001, another informant reported that he personally knew [petitioner] and that [petitioner] was the person that killed the clerk during the robbery of the Azteca Market. He was hesitant to provide details due to the fact that he was fearful for his safety. He said the Norteño gang members in the South Park area of Santa Rosa would kill him for providing police with information about the homicide. However, the informant eventually related that he was staying at his aunt's residence in the South Park area on June 3, 1999. At one point, an officer came to the door of the residence and informed them there had just been a shooting at the Azteca Market.

He informed the officer that he did not see or hear anything, and the officer subsequently left the residence. A short while later, the informant received a telephone call from [petitioner] who was at another residence in the South Park area. [Petitioner] asked the informant to come over to the residence and bring him a marijuana cigarette. Upon arrival at the residence, the informant noted that everyone was acting real strange. He contacted [petitioner] in the laundry room of the residence and said he was acting totally "bizarre" or "freaked out." When he asked him, "What's wrong?" [petitioner] replied, "I fucking shot this dude, I fucking shot this dude!" [Petitioner] told the informant that he and Orlando Moreno set up the robbery, noting that Moreno was a clerk at the market and told [petitioner] that there was $20,000 in the store. [Petitioner] and a second unidentified subject were supposed to go into the store when all the customers were gone. It was supposed to be a really quick robbery, but the victim grabbed [petitioner] and was trying to restrain him. During the struggle, the gun discharged and the victim was shot. [Petitioner] told the informant that the second suspect "freaked out" during the robbery and fled from the store, leaving him alone inside the store. The informant said [petitioner] had the gun with him in the laundry room and asked him to unload it, but he declined. He described the gun as a nickel-plated semi-automatic pistol with a wooden handgrip. The informant said he talked to [petitioner] for approximately 20 minutes and then returned home. The next morning, [petitioner] contacted him at his aunt's residence. He had a pair of gloves and asked the informant to put the gloves on and unload the pistol. The informant still refused to touch the pistol or to get involved.

This witness subsequently testified at the Preliminary Hearing on January 24, 2003. He testified that he did in fact meet with [petitioner] in the laundry room of a residence in the South Park area sometime after the shooting occurred. At the time, [petitioner] admitted to shooting the victim during the robbery, noting that the gun went off while he struggled with the victim. His statement was consistent with the statement provided in the initial criminal investigation; however, the witness testified that [petitioner] did not show him the weapon that night in the laundry room.

. . . .

[Petitioner] was subsequently arrested for the murder on August 1, 2002, the same day he turned himself in for a six month jail sentence for a felony assault by means of force likely to produce great bodily injury. It was noted that while he was detained in the Sonoma County Jail, he spoke with another inmate regarding his involvement in the offense. [Petitioner] described the crime for which he had been arrested, relating that he and possibly others went into the Azteca Market to commit the robbery. At one point, the victim "tried to be a hero," and [petitioner] shot him and tried to run out of the store. [Petitioner] reportedly told the inmate that other store employees attacked him physically as he tried to flee. He said he was able to get away and run into an alley at the rear of the store. He eventually made his way to a friend's house where he stayed for approximately two weeks. [Petitioner] reportedly told the inmate he had been putting in a lot of work for the Norteños on the street. At one point, he showed the

1
2
   inmate a tattoo on his back of a "S" and a "P" for South Park. The interior of the letters were red, showing he had done some major assaults as a Norteño gang member.

3  (Prob. Rpt. at 1-6.)

## DISCUSSION

### A.   Standard of Review

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings. Under the AEDPA, a federal court may not grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" Id. at 409. In examining whether the state court

1  decision was objectively unreasonable, the inquiry may require analysis of the state
2  court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir.
3  2003). The "objectively unreasonable" standard does not equate to "clear error"
4  because "[t]hese two standards . . . are not the same. The gloss of clear error fails to
5  give proper deference to state courts by conflating error (even clear error) with
6  unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B.     Legal Claims and Analysis**

Petitioner claims that the trial court's imposition of the upper term sentence for his convictions violated his Sixth Amendment right to a jury trial. (Am. Pet. at 7-8.) Respondent counters that petitioner is precluded from any relief because his habeas petition is untimely. (Resp't at 1, n.3.) In the alternative, respondent argues that the imposition of petitioner's sentence was not improper and that any error was at most harmless. (Id. at 5.)

1.     Statute of limitations

Under 28 U.S.C. § 2244(d) a prisoner has one year after his conviction becomes final in state court to file a federal habeas petition. The one-year period generally will run from "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Under the AEDPA, if a petitioner fails to seek a writ of certiorari from the United States Supreme Court, the one-year limitations period begins to run ninety-days from the date the state supreme court issues a judgment. See Miranda v.

Castro, 292 F.3d 1063, 1065 (9th Cir. 2002).  Furthermore, under the "mailbox rule," the one-year limitation period is tolled under 28 U.S.C. § 2244(d)(2) starting on the day the prisoner delivers his petition to prison authorities for forwarding to the court.  Stillman v. LaMarque, 319 F.3d 1199, 1201 (9th Cir. 2003).

Here, the California Supreme Court denied review of petitioner's claim on April 20, 2005.  (Resp't, Ex. D.)  Petitioner's one-year limitations period for filing with this Court began ninety days after that ruling, i.e., on July 19, 2005, and expired on July 19, 2006.  Although petitioner's habeas petition was not received by this Court until July 25, 2006, it is signed and dated as of July 17, 2006.  (Pet. at 18) (Docket No. 1).  In the interest of justice and avoidance of further delay, the Court will deem the petition filed on July 17, 2006, the day petitioner signed and presumably handed his petition to prison authorities to be delivered.  The Court now turns to the merits of petitioner's claim.

    2.    <u>Sentencing error</u>

Petitioner argues that the trial court's imposition of the upper term sentence was unconstitutional under Blakely v. Washington, 542 U.S. 296 (2004).  (Am. Pet. at 7-8.)  Petitioner alleges that his no contest plea did not constitute an admission of any aggravating factors regarding the controlling offense or the related enhancement and therefore, the trial court's imposition of the maximum sentence violated his Sixth Amendment right to a jury trial.  (Id.)

In rejecting petitioner's claim, the California Court of Appeal found that by agreeing that the maximum sentence of 21 years may be imposed, petitioner necessarily admitted his conduct to be of a degree to warrant such a punishment.  (Resp't, Ex. C at 4.)  Furthermore, the court concluded that substantial evidence of aggravating factors outweighed any evidence of mitigating factors and thus petitioner's sentence was appropriate.  (Id. at 6.)

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury,

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
N:\Pro - Se & Death Penalty\September 2010\06-04567Rivas06-4567_denyHC.frm 8

and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000). The "statutory maximum" for Apprendi purposes is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings. Blakely, 542 U.S. at 303-04. The Supreme Court has clarified that the middle term specified in California's statutes is the relevant statutory maximum. Cunningham v. California, 127 S. Ct. 856, 871 (2007) . Fact-finding to elevate a defendant's sentence beyond the prescribed middle term falls solely within the province of the jury. Id. at 292.

Failure to submit a sentencing factor to the jury is trial error and thus is subject to harmless-error analysis. Washington v. Recuenco, 548 U.S. 212, 221-22 (2006). Accordingly, a habeas petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or influence" on petitioner's sentence. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted). Under that standard, relief is appropriate where the Court is in "grave doubt" as to whether a jury would have found aggravating factors beyond a reasonable doubt. O'Neal v. McAninch, 513 U.S. 432, 436 (1995).

Under California law, "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." Cal. Penal Code § 1170(b). The California Rules of Court also provided that "[t]he middle term must be selected unless imposition of the upper or lower term is justified by circumstances in aggravation or mitigation." Cal. R. Ct. 4.420(a). Under the rules, "[c]ircumstances in aggravation and mitigation must be

1    established by a preponderance of the evidence," and "[s]election of the upper term
2    is justified only if, after a consideration of all the relevant facts, the circumstances in
3    aggravation outweigh the circumstances in mitigation." Id. at 4.420(b). The rules
4    also specify a non-exhaustive list of aggravating and mitigating factors, including
5    factors relating to the crime and factors relating to the defendant. See Id. at 4.421,
6    4.423. Furthermore, under California law, only one aggravating factor is necessary
7    to set the upper term as the maximum term, thus "any Apprendi error will be
8    harmless if it is not prejudicial as to just one of the aggravating factors at issue."
9    Butler v. Curry, 528 F.3d 624, 651 (2008).

10   At the time of petitioner's sentencing, voluntary manslaughter was
11   punishable by a term or 3, 6, or 11 years. Cal.Penal Code §192(a). Additionally,
12   any person convicted of personally using a firearm in the commission of an
13   attempted felony is subject to an additional and consecutive term of 3, 4, or 10 years.
14   Cal.Penal Code §122022.5(a).

15   Here, prior to petitioner's plea, the trial court expressly informed petitioner of
16   the potential that he would receive the maximum 21 years in state prison: "... I think
17   it more likely than not you would end up getting the 21 years. Do you understand
18   that?" to which the petitioner replied, "Yes." (CT at 111.) The court ultimately
19   sentenced petitioner to the maximum 21 years. (Id. at 122.) The trial court found
20   the following factors in aggravation: (1) the victim was particularly vulnerable
21   because he was a store employee at closing time; (2) petitioner maintained a position
22   of leadership in the commission of the robbery; and (3) "the facts and circumstances
23   of th[e] case are simply off the scale in terms of being compared to other
24   manslaughters." (Reporter's Transcript ("RT"), 5/27/04 at 2.) Although the court
25   found that petitioner had no prior record, the court ruled that the aggravating factors
26   outweighed this single mitigating factor. (Id.)

27   Petitioner argues that his acknowledgment of the potential of an upper term
28   sentence did not amount to an admission of the aggravating factors found by the

judge. (Am. Pet. at 11.) However, at no point has petitioner denied the factual allegations submitted in the probation officer's report and relied upon by the trial court in sentencing. In fact, petitioner indicated in his initial plea agreement that he fully understood that his sentence would be based largely upon the findings of the probation officer's report. (CT at 103.); see Blakely, 542 U.S. 296 at 310 ("When a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant . . . consents to judicial factfinding"). Furthermore, prior to the imposition of petitioner's sentence, his counsel urged the court to adopt the 16 year sentence suggested by the probation officer, calling the report "well reasoned . . . . thoughtful" and "objective." (RT, 5/27/04 at 3.) Because petitioner has never alleged that the findings in the probation officer's report are false, the Court may presume them to be accurate.

      Taking the facts in the probation officer's report as true, petitioner has failed to show that he is entitled to habeas relief. Among other factors in aggravation, the trial court found the victim to have been particularly vulnerable because his store was closed late at night. (RT, 5/27/04 at 2.); see Cal.Rules of Ct., rule 4.421(a)(3). The evidence shows that petitioner and another man entered the Azteca Market at around 9:00 PM, over thirty minutes after the store had closed. (Prob. Rpt. at 2.) The victim was unarmed, and his business took in $10,000 to $20,000 in cash on a daily basis. (Id. at 2.) Petitioner openly admitted his intention to rob the business. (Id. at 7.) While the trial court did not explicitly cite the facts supporting his sentencing decision, the evidence certainly provides a sufficient basis upon which to conclude that the victim was particularly vulnerable.

      The trial court also found evidence that petitioner maintained a position of "apparent dominance or leadership" in the commission of the robbery. (RT, 5/27/04 at 2.); see Cal.Rules of Ct., rule 4.421(a)(3). The probation officer's report shows that petitioner admitted to obtaining a handgun the evening before the crime for the purpose of robbing the Azteca Market. (Prob. Rpt. at 7.) Petitioner entered the

market first, pointed the gun at the victim demanding the money and ultimately shot and killed the victim. (Id. at 2.) The second suspect "was standing behind [petitioner] and did not say anything and looked around nervously." (Id.) The evidence certainly supports the inference that petitioner took the lead by obtaining a handgun and holding the victim at gunpoint while the second suspect stood by.

Because only a single aggravating factor is necessary to impose the upper term sentence for each of petitioner's convictions, the trial court's imposition of the maximum term was appropriate. Butler, 528 F.3d at 651. The probation officer's report clearly supports the inference that the victim was particularly vulnerable as a unarmed clerk working late at night and that petitioner acted in a position of leadership in the commission of the crime. The trial court found the factors in aggravation outweighed any factor in mitigation, and this Court cannot say that the imposition of the upper term was inappropriate. Petitioner has failed to raise grave doubt that a reasonable trier of fact would not have found the aggravating factors beyond a reasonable doubt. O'Neal, 513 U.S. at 436. Even if any error was committed by the trial court in sentencing, petitioner has not shown that he was prejudiced. Thus, the state court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts presented. See 28 U.S.C. § 2254(d).

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009). Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural

ruling." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Accordingly, a COA will be denied.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus and a COA are DENIED.

DATED: September 2, 2010

JAMES WARE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAFAEL RIVAS, | Case Number: CV06-04567 JW |
| Plaintiff, | **CERTIFICATE OF SERVICE** |
| v. | |
| THOMAS FELKER et al, | |
| Defendant. | |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 3, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Rafael Rivas V-37346
La Palma Correctional Center
5501 N. La Palma Rd.
Eloy, AZ 85231

Dated: September 3, 2010

Richard W. Wieking, Clerk
/s/ By: Elizabeth Garcia, Deputy Clerk

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
N:\Pro - Se & Death Penalty\September 2010\06-04567Rivas06-4567_denyHC.frm